**Paul G. LUSSIER, et al., Plaintiffs,**

v.

**STATE OF FLORIDA, DEPARTMENT OF HIGHWAY SAFETY AND MOTOR VEHICLES, Defendant.**

**No. 96–127–Civ–Oc–10C**

United States District Court, M.D. Florida, Ocala Division.

July 21, 1997.

Stephen R. Senn, Lakeland, FL, for Plaintiffs.

Eric Joseph Taylor, Office of Atty. Gen., Corrections Litigation Branch, Tallahassee, FL, for Defendant.

## ORDER AND OPINION

HODGES, District Judge.

At issue in this case is whether the Tax Injunction Act, 28 U.S.C. § 1341, precludes a federal court from considering a challenge to a Florida statute that imposes a charge by the state for the issuance of special parking permits for the disabled. Because I conclude that the assessment is a tax under state law and that the Florida state courts provide an adequate forum for the pursuit of the Plaintiffs' federal claims, the Defendant's motion to dismiss (Doc. 3) will be granted and the case dismissed for want of subject matter jurisdiction.

### BACKGROUND

Since 1977, the Florida legislature has required that both public and private entities make provision for safe and convenient parking for the disabled. The statute requires that state and municipal agencies, as well as private owners of commercial real estate, provide a minimum number of restricted parking spaces for the disabled situated near the entrances of their particular facilities and conforming to certain minimum specifications. In order to park in a restricted space, one must have and display an exemption parking permit—a blue placard with the internationally accepted wheelchair symbol printed on it. Use of a restricted parking space without an exemption parking permit is punished by the imposition of a civil penalty.

Exemption parking permits are issued by the Defendant to individuals with those disabilities enumerated in Fla.Stat. § 320.0848. Between 1990 and 1996, an individual applying for an exemption parking permit was charged fifteen dollars for the initial permit and one dollar for any additional permit. Fla. Stat. § 320.0848(2)(c)(1) (1995). The statute also required that the permit be renewed every four years at a cost of fifteen dollars for the renewal permit and one dollar for each additional permit.[1]

The Plaintiffs seek to represent a class of people qualified to acquire permanent exemption permits under the statute who have paid, or who will be required to pay, for an initial or renewal permit or for an additional permit. The Plaintiffs' complaint (Doc. 1) alleges that the charges exacted by the state for these permits constitute discrimination in the provision of public services violative of the Americans With Disabilities Act (ADA). 42 U.S.C. § 12131, et seq. (1995). At the heart of the Plaintiffs' claim is the contention that a public entity may not permissibly

---

1. Persons with disabilities that are temporary in nature may obtain temporary exemption permits pursuant to Fla. Stat. § 320.0848(c)(3). These permits are not at issue in this litigation.

charge the disabled for measures taken to provide the nondiscriminatory treatment required by the Act. *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(f). The payment required by the statute, in the Plaintiffs' view, is a surcharge on a public accommodation of the Plaintiffs' disabilities and therefore illegal under the Act. The complaint prays for declaratory and injunctive relief as well as a refund of sums already paid.

The Defendant has filed a motion, pursuant to FED.R.CIV.P. 12(b)(1), to dismiss the complaint on the basis that the exercise of federal jurisdiction is prohibited by the Tax Injunction Act. 28 U.S.C. § 1341 (1995).[2] The gist of the Defendant's position is that the provision of any or all of the relief requested by the Plaintiffs would necessarily involve enjoining, restraining or suspending the collection of a state tax, and that the state courts are structurally capable of providing the Plaintiffs with a full and fair hearing on their ADA claim.

The Florida legislature substantially revised Fla. Stat. § 320.0848 in May 1996 and the amended statute became effective on October 1, 1996, during the pendency of this litigation. As they apply to the issuance of permanent exemption parking permits, the 1996 amendments effected three major changes. First, the amendments revised the renewal provisions so that the renewal date of the permit is keyed to the renewal date of the permitholder's driver's license or identification card. Fla. Stat. § 320.0848(1)(a) (1997). Second, the amendments altered the schedule of payments for the exemption parking permits. Where the renewal date of the permit matches the renewal date of the applicant's drivers license, which is renewable every six years, the applicant is charged $ 22.50 for the initial permit and each renewal permit, and $ 1.50 for each additional permit. Fla.Stat. § 320.0848(c)(1)(a)–(b) (1997). *See* Fla.Stat. § 322.18(2)(a)(drivers licenses generally renewable each six years). When the renewal date of the permit is tied to that of the applicant's state identification card, the initial and renewal permits cost $ 15 and each additional permit costs $ 1. Fla. Stat. § 320.0848(c)(1)(c)–(d) (1997). *See* Fla. Stat. 322.051. Finally, the statute, as amended, provides that the bulk of the money collected from the issuance of the permits shall be deposited in the State Transportation Trust Fund.[3]

The Court has permitted substantial discovery on the issues raised by the motion and the parties have filed supplemental briefs in light of this discovery. Additionally the Defendant has amended its motion to dismiss (Doc. 37) to argue that, even if federal jurisdiction is not barred by the Tax Injunction Act, several of the abstention doctrines militate against the assertion of jurisdiction over the subject matter of the litigation. The Plaintiffs filed their response and the motion subsequently became ripe for decision.

### DISCUSSION

*A. Mootness*

■ In its memorandum of law (Doc. 38) supporting the amended motion to dismiss, the Defendant argues that parallel and ongoing state court litigation embraces challenges to both the 1990 and 1996 versions of Fla. Stat. § 320.0848, and that this Court should defer to that proceeding. Implicit in this position is the premise that the Plaintiffs' claims in this Court do not reach both statutes and, as a necessary concomitant, that the Plaintiffs' claims for declaratory and injunctive relief are moot.[4] This is not the case. The amendments to Fla. Stat. § 320.0848, which became effective after the

---

2. 28 U.S.C. § 1341 provides:

    The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

3. Specifically, with regard to the six year permits, $ 20.25 is directed to the trust fund and $2.25 is retained by the tax collector of the county in which the permit was purchased. With respect to the four year permits, the trust fund gets $ 13.50 and the tax collector gets $ 1.50. All proceeds derived from the sale of additional permits are allocated to the trust fund. As shall be seen, prior to the 1996 amendments, the statute was ambiguous with regard to the ultimate disposition of the funds collected.

4. As the Plaintiffs' claim for damages, i.e., a refund of sums already paid, relates directly to the statute as it existed between 1990 and 1995, there can be no argument that this claim presents anything but a "live" controversy.

inception of the suit, have no effect on the continuing existence of a live controversy. The Plaintiffs' claim is not that the amount or ultimate disposition of the assessment violates federal law, but that *any* charge imposed upon a disabled individual for an exemption parking permit does so. Any changes in the frequency with which the permit must be renewed or changes of the amount charged for the permit, or the ultimate disposition of the proceeds, do not ameliorate the harm the Plaintiffs will allegedly suffer from paying an assessment which they claim is illegal in any amount. The claims for declaratory and injunctive relief are not moot.

### B. Subject Matter Jurisdiction under the Tax Injunction Act

■ There are two types of challenges to subject matter jurisdiction properly raised under Rule 12(b)(1)—facial challenges and factual challenges—and each variety of challenge can be subject to a different standard of proof. A facial challenge is an attack on jurisdiction as pleaded in the complaint, and the court need only examine the complaint, taking its allegations as true, to determine whether it sufficiently alleges a basis of federal jurisdiction. *Garcia v. Copenhaver Bell & Assoc.*, 104 F.3d 1256, 1260–61 (11th Cir. 1997). A factual challenge to subject matter jurisdiction is a challenge to the existence of federal jurisdiction *in fact* and requires that the court reach beyond the pleadings and evaluate the evidence presented by the parties in an effort to determine whether jurisdiction actually exists. *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir.1990).

This case involves a factual attack on jurisdiction. In the first instance, the issues presented by a Tax Injunction Act challenge to subject matter jurisdiction are inherently factual, i.e., the Court must determine whether the charge at issue is a "tax" and whether the remedy under state law is "plain, speedy and efficient." More, the parties have taken extensive discovery on the issues raised by

the Defendant's motions and have submitted thorough briefs contesting the facts and inferences to be drawn from them. In short, the parties have litigated the motion as a factual attack on jurisdiction.

Once the court has determined that a factual attack on federal jurisdiction is waged, it must then decide whether the attack directly implicates the substantive merits of the cause of action. If the jurisdictional challenge relates to an essential element of the Plaintiffs' cause of action, the Court should evaluate the Rule 12(b)(1) motion as it would a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Garcia*, 104 F.3d at 1261 (*quoting Williamson v. Tucker*, 645 F.2d 404, 415–16 (5th Cir.1981), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981)). On the other hand, where the jurisdictional question is unrelated to the merits of the underlying claim, the court may weigh the evidence and "satisfy itself as to its existence of its power to hear the case ... no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from deciding for itself the merits of the jurisdictional claims." *Lawrence*, 919 F.2d at 1529 (*quoting Mortensen v. First Federal Sav. & Loan Ass'n.*, 549 F.2d 884, 891 (3d Cir.1977)).

The attack on jurisdiction here is plainly unrelated to the merits of the underlying ADA claim. The Tax Injunction Act inquiry is focused on whether the charge for exemption parking permits is a "tax under State law" and whether Florida's courts provide an adequate venue for the pursuit of the Plaintiffs' federal claims. *See infra* p. 1417. The disposition of the Plaintiffs' claim under the Americans with Disabilities Act will rest on the Plaintiffs' contention that Fla. Stat. § 320.0848 discriminates against qualified individuals with disabilities, regardless of whether or not the statutory assessment is a "tax under State law" and irrespective of whether the state courts provide a "plain, speedy and efficient remedy."[5]

---

5. The Court is aware that the Department of Justice regulation relied upon, in part, by the Plaintiffs speaks of surcharges "to cover the costs" of the provision of nondiscriminatory treatment to the disabled and thus that the jurisdictional inquiry into whether the assessment is in fact a tax may appear to implicate the merits of the Plaintiffs' claim. 28 C.F.R. § 35.130(f) (1994). However, it is clear, from a reading of the complaint as a whole that the Plaintiffs contend that the entire assessment imposed by

Accordingly, the Court will decide the motion by evaluating all of the evidence presented in an endeavor to satisfy itself as to the existence or nonexistence of federal subject matter jurisdiction over the Plaintiffs' claim.

Turning, then, to the substance of the Defendants' motion, it is instructive to consider both the text and the purpose of the Tax Injunction Act. Enacted in 1937, the statute was a legislative response to an increasing number of suits seeking injunctive relief against state officers in the wake of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 669 (11th Cir.1984)(*quoting* Note, "The Tax Injunction Act and Suits for Monetary Relief," 46 U.Chi. L.Rev. 736, 739 (1979)). Grounded in principles of federalism, the Act was a congressional recognition of the potentially disruptive effect of federal equitable relief on the effective operation of state government. *Franchise Tax Bd. of California v. Alcan Aluminum Ltd.,* 493 U.S. 331, 338, 110 S.Ct. 661, 666, 107 L.Ed.2d 696 (1990); *California v. Grace Brethren Church,* 457 U.S. 393, 409, 102 S.Ct. 2498, 2508, 73 L.Ed.2d 93 n. 22 (1982). The statute, therefore, represents the congressional judgment that federal interference with the state fisc in general, and with state tax assessment and collection in particular, ought to be avoided when state fora provide adequate procedures for the vindication of federal rights. *Grace Brethren Church,* 457 U.S. at 408, 102 S.Ct. at 2508.

The Tax Injunction Act thus operates to divest the federal courts of subject matter jurisdiction over claims challenging state taxation procedures where the state courts provide a "plain, speedy and efficient remedy." *Rosewell v. LaSalle Nat'l Bank,* 450 U.S. 503, 515 n. 19, 101 S.Ct. 1221, 1230 n. 19, 67 L.Ed.2d 464 n. 19 (1980). Specifically, the Act will bar jurisdiction over an action which would (1) "enjoin, suspend or restrain;" [6] (2) a state imposed tax; (3) where the state provides a "plain, speedy and efficient reme-

dy." The Plaintiffs make three arguments in response to the Defendant's challenge to federal jurisdiction under the Act—that the statutory waiver of sovereign immunity in the ADA also waives any protection afforded to the states by the Tax Injunction Act; that the charge for the exemption parking permit is not a "tax under State law;" and that Florida's courts do not afford a "plain, speedy and efficient" process for the assertion of their federal rights.

### 1. The Tax Injunction Act and the ADA

In order to fully grasp the issues and applicable principles governing the present dispute, one needs to understand the Eleventh Amendment to the Constitution and the Rehabilitation Act of 1973, 29 U.S.C. § 794, the statutory predecessor to the Americans With Disabilities Act. The Eleventh Amendment prohibits the exercise of federal jurisdiction over "any suit in law or equity commenced or prosecuted against one of the United States by Citizens of another State or Citizens or Subjects of any Foreign State." Although the text of the amendment does not so provide, the Supreme Court decided long ago that the Eleventh Amendment also precludes a citizen from bringing an action against his or her own state in federal court. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

The scope of the Eleventh Amendment is limited, however. In the watershed case of *Ex Parte Young,* a federal court in Minnesota preliminarily enjoined the state's Attorney General from enforcing, through criminal or civil prosecutions, a railroad rate reduction law alleged to be unfairly confiscatory and in violation of the Fourteenth Amendment to the Constitution. After the federal court entered its order granting the preliminary injunction, the Attorney General commenced a mandamus proceeding in state court in an attempt to enforce the law and was subsequently adjudged in contempt and confined

---

§ 320.0848(c)(1) is invalid regardless of its purpose.

**6.** Actions for declaratory and injunctive relief, as well as refund actions for money damages, will run afoul of the Act's broad proscription. *Osceola v. Florida Dep't of Revenue,* 893 F.2d 1231,

1232–33 (11th Cir.1990), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 674, 112 L.Ed.2d 667 (1991). The relief requested by the Plaintiffs, if granted, would clearly "enjoin, suspend or restrain" the collection of the assessment for the exemption parking permit and the Plaintiffs make no argument to the contrary.

by the federal judge. Young petitioned the Supreme Court for a writ of habeas corpus and certiorari arguing that the Eleventh Amendment divested the federal court of jurisdiction to enjoin his enforcement of the Minnesota statute. The Court denied the petition and held that a suit to enjoin a state officer seeking to enforce an unconstitutional law is not a suit against "one of the United States" prohibited by the Eleventh Amendment. 209 U.S. at 159–60, 28 S.Ct. at 453–54. Reasoning that the enforcement of an unconstitutional law is an act outside the aegis of legitimate state authority, the Court concluded that when a state official attempts to do so he "is stripped of his official or representative character and subjected in his person to the consequences of his individual conduct." *Id.*

While *Ex Parte Young* certainly cut a broad swath, its authorization of suits against state officials is limited to suits seeking prospective relief—that is, relief, such as an injunction, designed to prevent future violations of federal law—and federal courts will remain without jurisdiction to consider claims against state officials for retrospective relief intended to compensate a plaintiff for past deprivations of federal rights. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In *Edelman,* a class of plaintiffs brought suit against the Cook County Illinois Director of Public Aid and the Comptroller of Cook County alleging that they were administering the federal-state Aid to the Aged, Blind and Disabled program in violation of federal regulations and the Fourteenth Amendment. The plaintiffs requested declaratory and injunctive relief and, as a part of their claim for injunctive relief, an injunction requiring the defendants to pay all AABD benefits wrongfully withheld. The Supreme Court held that the Eleventh Amendment precluded the requested injunction. The Court reasoned that the requested award of retroactive benefits "must be met from the general revenues of a State" and thus that the claim was not a claim to prevent future violations of federal law, but was, in effect, a suit against the state prohibited by the Eleventh Amendment. 415 U.S. at 664, 94 S.Ct. at 1356. While *Ex Parte Young* permits the granting of relief to secure "compliance in the future with a substantive federal-question determination" (even if that relief requires the expenditure of state funds), the Court concluded, a retroactive monetary award, although labeled as equitable relief, "is in practical effect indistinguishable ... from an award of damages against the state." 415 U.S. at 668, 94 S.Ct. at 1358.

There are two exceptions to the Eleventh Amendment's curtailment of the federal judicial power. First, a state may be sued in federal court when it has clearly and unequivocally waived the immunity conferred to it by the Eleventh Amendment. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 n. 2 (1985). Second, the Congress may trump the states' Eleventh Amendment immunity and authorize suits against states and their officials when legislating pursuant to § 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). Like a state's voluntary waiver of its immunity, a Congressional abrogation of the Eleventh Amendment must be unequivocal and leave no room for any contrary construction if it is to be effective. *Atascadero,* 473 U.S. at 239–40, 105 S.Ct. at 3146.

In *Atascadero,* the plaintiff, who suffered from diabetes and a loss of sight in one eye, brought suit against a state hospital claiming that the hospital refused to hire him because of his disabilities in violation of the Rehabilitation Act of 1973. 473 U.S. at 236, 105 S.Ct. at 3144. The plaintiff argued that the Eleventh Amendment did not bar the suit because Congress, by authorizing private suits to redress violations of the Act and by granting the federal courts jurisdiction to hear those cases, had abrogated the states' immunity from suit in federal court. The Court disagreed and held that "[a] general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment." 473 U.S. at 246, 105 S.Ct. at 3149.

In enacting the Americans with Disabilities Act, the Congress reacted to the Court's holding in *Atascadero* and provided that:

[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a]

Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State. 42 U.S.C. § 12202 (1995).

■ The Plaintiffs argue that the statute not only abrogates the states' Eleventh Amendment immunity, but that it also creates an exception to the jurisdictional bar leveled by the Tax Injunction Act.[7] Specifically, the Plaintiffs maintain that the first sentence of the statute effectively disposes of the Eleventh Amendment and that the second sentence of the statute should be read to strip the states of all other privileges and immunities available to them in federal court because of their status as states. When thus read, the Plaintiffs conclude, the statute requires that the protection afforded to state tax assessments by the Tax Injunction Act must yield to ADA challenges. The argument is not persuasive.

It appears from both the statutory language and Eleventh Amendment jurisprudence that the second sentence of the statute is meant only to clarify the congressional intention that states be subject to both prospective and retrospective relief under the Americans With Disabilities Act. Under the rule of *Edelman v. Jordan,* a federal court can, without implicating the Eleventh Amendment, order prospective relief against a state officer, while it remains without jurisdiction to order retrospective relief intended to compensate a plaintiff for a past deprivation of a federal right. However, where Eleventh Amendment immunity has been abrogated by the Congress, the state becomes subject to the entire battery of relief which federal courts are free to order in cases where the state is not a party. *Fitzpatrick v. Bitzer,* 427 U.S. at 453–56, 96 S.Ct. at 2668–69. *See* CHARLES ALAN WRIGHT, LAW OF FEDERAL COURTS § 48 at 310–12 & nn. 24–25

(5th Ed. 1994). Thus, the second sentence of the statute is reasonably read as merely complementing the first by expressing the legislative desire to make states subject to all of the remedies offered by the Americans With Disabilities Act without regard to whether that relief is forward or backward looking.

The legislative history concerning the statutory abrogation of sovereign immunity supports this construction of the statute. In enacting § 12202, as previously noted, the Congress was solely concerned with vitiating the states' Eleventh Amendment immunity in the clear and unequivocal language required by *Atascadero.* H.R.Rep. 101–485 (I–IV)("This provision was included to meet the requirements of *Atascadero State Hospital v. Scanlon").* On the other hand, the legislative history is bereft of any evidence that would even suggest that the Congress intended broader abrogation of the specific protections afforded to state governments from federal interference by the Tax Injunction Act; and, applying the rule of *Atascadero,* if Congress had so intended, it could accomplish that intent only through clear and unmistakable language. The Congress has not employed the explicit language necessary to effect such a far reaching expansion of the jurisdiction of the federal courts, and the Court will not create one by "judicial interpretation." *American Fire & Cas. Co. v. Finn,* 341 U.S. 6, 17, 71 S.Ct. 534, 542, 95 L.Ed. 702 (1951).

### 2. *Fla.Stat. § 320.0848 as a "Tax under State Law"*

■ Not all exactions by a state from its citizens are taxes within the meaning of the Tax Injunction Act. Rather, the Act will only preclude federal review of state laws that are intended to raise revenue for the benefit of the general public as opposed to those assessments that are imposed as a fee incident to regulation. *Miami Herald,* 734 F.2d at 670. *See Bidart Bros. v. The California Apple Comm'n.,* 73 F.3d 925, 928–29 (9th Cir.1996); *San Juan Cellular Tel. Co. v.*

7. The parties assume, since no one contends otherwise, that Congressional abrogation of Eleventh Amendment immunity by the ADA was accomplished through § 5 of the Fourteenth Amendment. The Supreme Court in *Atascadero*

implied that this was possible of accomplishment. 473 U.S. at 244, n. 4, 105 S.Ct. at 3148, n. 4. The Court will assume, as have the parties, that the Eleventh Amendment, as opposed to the Tax Injunction Act, poses no bar to this action.

*Public Serv. Comm'n. of Puerto Rico,* 967 F.2d 683, 685 (1st Cir.1992). Fees can serve regulatory purposes as distinguished from general public purposes in one of two ways: either by discouraging particular conduct through the device of making it more costly, or by generating income ear marked to cover the cost of the regulation. *See San Juan Cellular,* 967 F.2d at 685. In determining whether a financial exaction by the state is a tax or a fee, the label given the assessment is not dispositive; rather, the court must inquire into the purpose of the assessment, i.e. what function the assessment was intended to serve.

Focusing first on the Plaintiffs' claim for a refund of money paid pursuant to the statute as it existed prior to the 1996 revisions, Fla. Stat. § 320.0848(c)(1) (1995) provides:

> [T]he fees for the exemption parking permit and renewal are $ 15 for the initial permit, $ 1 for each additional parking permit, $ 15 for each renewal parking permit, and $ 1 for each additional renewal parking permit. The Department of Highway Safety and Motor Vehicles shall receive $ 13.50 from the moneys derived from the proceeds of the initial exemption parking permit fee and $ 13.50 from the moneys derived from the proceeds of the renewal fee therefor, and the tax collector of the county in which the fee was generated shall receive $ 1.50 from each such fee, to defray the expenses of administering this section.

The Plaintiff argues that the last phrase of the statute clearly establishes that the $ 15 assessment is a regulatory fee. However, it is unclear whether the phrase "to defray the expenses of administering this section" modifies the disposition of the entire fifteen dollar assessment or simply the $ 1.50 charged by the tax collector.[8]

■ While they are in disagreement about the proper categorization, for Tax Injunction Act purposes, of the $ 13.50 directed to the Defendant, the parties do agree that the money directed to the local tax collectors is intended to "defray the expenses" associated with regulatory administration and, therefore, that component of the statute is properly considered as imposing a fee. When an assessment serves both a revenue generating and a regulatory purpose, the court must determine whether jurisdiction can be asserted over the claim insofar as it concerns the regulatory portion of the statute without "doing violence to the revenue raising provisions of the measure." *Miami Herald,* 734 F.2d at 671.

Assuming, for the moment, that the $ 13.50 directed by statute to the Defendant is in fact a revenue generating provision, the Court concludes that it cannot pass on the legality of the regulatory portion of the statute without threatening to disturb the statute's dominant tax purpose. To hold that the fee allocated to the Tax Collector is enjoinable under the ADA would disrupt the statutory scheme of administration and enforcement of the permit program, and would threaten the collection of the tax itself, i.e., the very thing that the Tax Injunction Act was intended to prevent. The question of whether the statute imposes a tax or a fee must therefore be resolved with reference to the purpose of the distribution of that portion of the revenues allocated to the Defendant.

■ The statute is ambiguous and the legislative history concerning its 1990 revision is unclear. However, the ultimate use of the money obtained by charging for exemption parking permits, and the legislature's ratification of that ultimate use, is sufficient to convince the Court that § 320.0848(c)(1) (1995) was intended to raise revenue and not to cover the costs incident to regulation or administration.

The ultimate use of the funds collected pursuant to the statute make clear that the funds are spent on general public purposes. *See Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 713 (2nd Cir.1993); *San Juan Cellular,* (reasoning that where the purpose of the assessment is not clear, the ultimate use of the

---

8. The last comma renders the statute ambiguous. If the Florida legislature intended to express the purpose of both distributions, a separate sentence explaining that the purpose of both was to defray regulatory expanse would have clearly stated the matter. On the other hand, if the legislature intended only that the $ 1.50 collected by the tax collector be used to defray his or her administrative costs, then the last comma in the last sentence is unnecessary.

revenue—for public or regulatory purposes—is highly relevant). Although the parties dispute exactly what the legislature intended in enacting the statute and exacting the exemption permit charge, they do not dispute that the Defendant has, at all times material to this action, disbursed all of the money derived from the exemption parking permit charges pursuant to Fla. Stat. § 320.20, which provides for the disposition of license tax funds. That statute requires that the "revenue derived from the registration of motor vehicles" be deposited in the Capital Outlay and Debt Service School Trust Fund with the Florida Department of Education and in the State Transportation Trust Fund with the Department of Transportation. Fla. Stat. § 320.20(1), (2) (1995).[9] The disposition of the permit proceeds through the Departments of Education and Transportation is clearly for the benefit of the general public and the Plaintiffs do not argue otherwise. See Fla. Const. Art. XII § 9(d) (1995); Fla. Stat. § 206.46 (1995).

The Florida legislature has never acted to change the manner in which the Defendant disposes of the money acquired pursuant to the exemption parking permit program.[10] Even more importantly, the legislature has recently amended the statute to authorize the distribution of the revenue generated by the Defendant in a manner similar to that undertaken by the Defendant in the past. Under the amended statute, the Defendant remains the issuing agency for the permits; however, the proceeds which, prior to 1996, were collected by the Defendant, now go directly and entirely to the State Transportation Trust Fund. While the Department of Education no longer appears to receive a portion of the money collected, the legislature has specifically directed that the proceeds be used for a general public purpose in a manner similar to that existing during the time period relevant to this action. In short, the 1996 amendments to the statute represent a ratification of the preexisting practice and provide persuasive evidence that the $ 13.50 per permit charged by the Defendant between 1990 and October 1996 was always intended to benefit the general public. It therefore represents a tax within the meaning of the Tax Injunction Act.

### 3. Remedies Afforded in Florida Courts

Although the assertion of federal jurisdiction may interfere with state tax assessment and collection, such jurisdiction will nonetheless exist if the state fails to provide a "plain, speedy and efficient remedies" in its courts. The plain, speedy and efficient remedy contemplated by the Tax Injunction Act

9. Although the charge for the exemption parking permit may not, on its face, appear to be "revenue derived from the registration of motor vehicles," within the meaning of Fla. Stat. § 320.20, it is undisputed that the Defendant did, in fact, disburse the money derived from the sale of the permits pursuant to that statutory procedure. The Plaintiffs argue that the Defendant believed it was legally obligated to spend the money in this manner because Fla. Stat. § 320.0848—the exemption parking permit statute—did not expressly authorize it to deposit the money into its own operating account. The Plaintiffs urge that this position was not justified by any legal opinion of the Attorney General or other arm of state government. The lack of some formal legal opinion justifying the Defendant's disbursement of the proceeds notwithstanding, it is plausible that the legislature did not expressly authorize the deposit of the money to the Defendant's operating account because it did not intend that it be deposited there. In any event, what is clear about the Defendant's disbursement of the funds is that it deployed them in the manner prescribed by § 320.20 during the five year time period relevant to this discussion and without legislative direction to the contrary.

10. The Plaintiffs do maintain that the Defendant was reimbursed by the Florida legislature for the cost of administering the permit program under the General Appropriations Act and that the reimbursement was "probably darn close" to the total revenue generated by the program. The Defendant maintains that the actual cost of the permit program to it is far less than the revenue generated by the charges for the exemption permit charges. While neither party has presented particularly convincing evidence on this score, the Plaintiffs' most current evidence of the legislature's intention in this regard relates to the administration of the statute around 1985, five years before the statute was again revised in 1990. It is the 1990 revision of the statute that is pertinent to the claims made in this case and the Plaintiff has presented no evidence of the reimbursement, if any, made by the legislature to the Defendant between 1990 and 1996 and, if such reimbursement was made, what its relationship to the cost of program administration by the Defendant was. Thus, the Plaintiffs' argument on this score is entitled to little weight.

requires only that the state provide certain minimal procedural protections against illegal tax collection. *Franchise Tax Board*, 493 U.S. at 338–39, 110 S.Ct. at 666; *Rosewell*, 450 U.S. at 512, 101 S.Ct. at 1229. The state need only provide a full hearing at which a taxpayer may present and secure a judicial determination of his or her federal law objections to the tax such that they are preserved for review by the United States Supreme Court, if necessary. *Rosewell*, 450 U.S. at 512–13, 101 S.Ct. at 1229; *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1244–45 (11th Cir.1991).

The Eleventh Circuit Court of Appeals has decided that Florida's courts provide remedies sufficient to satisfy the Tax Injunction Act. *Osceola v. Florida Dep't. of Revenue*, 893 F.2d 1231, 1233 (11th Cir.1990), *cert. denied*, 498 U.S. 1025, 111 S.Ct. 674, 112 L.Ed.2d 667 (1991). *See Winicki v. Mallard*, 783 F.2d 1567, 1570 (11th Cir.1986), *cert. denied*, 479 U.S. 815, 107 S.Ct. 70, 93 L.Ed.2d 27 (1986). The circuit courts of Florida have jurisdiction to hear challenges to any state tax; may issue declaratory and injunctive relief; and taxpayers have a statutory procedure by which they may seek a refund from the state. *Osceola*, 893 F.2d at 1233. This precedent would seem to dictate the result here.

▆▆▆ The Plaintiffs argue, however, that their right to a refund is not certain because the Florida courts refuse to order refunds when the governing entity acted in good faith in imposing the tax or where other equitable considerations militate against ordering the refund. *Gulesian v. Dade Cty. School Bd.*, 281 So.2d 325 (Fla.1973); *Dryden v. Madison Cty.*, 672 So.2d 840 (Fla. 1st DCA 1996). The due process clause of the Fourteenth Amendment will not abide this result, however, where a plaintiff raises a federal constitutional challenge to a state imposed tax after having been forced to pay the tax and then litigate the legality of the tax in an action for a refund. *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990); *Dep't of Revenue v. Kuhnlein*, 646 So.2d 717 (Fla. 1994). The Plaintiffs claim that because this case involves a federal statutory challenge to a tax, as opposed to a federal constitutional challenge, the Florida courts may not be inclined to order a refund. No authority is cited for this conclusion (that the Florida courts would refuse to order a refund if federal statutory law, as opposed to federal constitutional law, required it), however, and this Court will not assume that the state courts will not follow and apply the law as they find it. If a federal statute validly prevents the imposition of a state tax, then the federal statute prevails under the Supremacy Clause and the state courts are just as duty bound to apply that law as this court is.

▆▆▆ Moreover, the Plaintiffs' argument ignores the fact that the inquiry into whether a state court remedy is adequate for the purposes of the Tax Injunction Act is directed to the *procedural* opportunities offered to the taxpayer, not the likely ultimate substantive outcome. *Rosewell*, 450 U.S. at 514–15, 101 S.Ct. at 1229. The judicial interpretation of the Act emphasizes whether the state has created a forum in which a taxpayer can raise his or her federal claims, not whether the state will provide the substantive result that a plaintiff desires. *Colonial Pipeline*, 921 F.2d at 1245 ("[A] reviewing court should eschew any analysis of their [state remedies'] substantive sufficiency so long as a complainant has some opportunity to raise his constitutional objections"). In other words, the Tax Injunction Act does not require that the state and federal remedies be identical for the jurisdictional bar to apply. *See* Fla. Stat. §§ 72.011, 215.26 (1995)(detailing procedure for seeking refund of tax from state comptroller and securing judicial review of any denial).

The Florida courts provide a "plain, speedy and efficient" mechanism for review of the Plaintiffs' challenge to § 320.0848 and this Court is thus without jurisdiction to consider the claims.

Accordingly, upon due consideration,

(1) the Plaintiffs' motions to strike (Docs. 11, 35) are DENIED.

(2) The Defendants' motion to dismiss (Doc. 3) is GRANTED and this case is DISMISSED, without prejudice, for lack of subject matter jurisdiction.

The Clerk is directed to terminate all other pending motions, enter judgment accordingly and close the file.

IT IS SO ORDERED.